1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3   Before The Honorable Paul S. Grewal, Magistrate Judge

4

5   ADAPTIX, INC.,                    )
                                      )
6            Plaintiff,               )
                                      )
7   vs.                               )   No. C 14-01385-PSG
                                      )
8   SONY MOBILE COMMUNICATIONS,       )   Related Case Nos.:
    INC., et al.,                     )   C 14-01379-PSG
9                                     )   C 14-01259-PSG
             Defendant.               )   C 14-02359-PSG
10  _____    )   C 14-02360-PSG
                                          C 14-02895-PSG
11                                        C 15-00364-PSG
                                          C 15-00367-PSG
12                                        C 15-00366-PSG
                                          C 15-00367-PSG
13                                        C 15-00962-PSG
                                          C 15-00971-PSG
14                                        C 15-00972-PSG

15                                    San Jose, California
                                      Monday, November 23, 2015
16
    <u>TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND</u>
17           <u>RECORDING 4:29 - 5:25 = 54 MINUTES</u>

18
    <u>APPEARANCES</u>:
19
    For Adaptix:
20                                    Hayes Messina Gilman & Hayes
                                      200 State Street
21                                    6th Floor
                                      Boston, Massachusetts 02109
22                         BY:   JAMES J. FOSTER, ESQ.

23

24           (APPEARANCES CONTINUED NEXT PAGE)

25

1  APPEARANCES: (Cont'd.)

2  For Verizon Wireless:
                        Wilmer Cutler Pickering Hale
3                         & Dorr LLP
                        950 Page Mill Road
4                       Palo Alto, California 94304
                   BY:  GEOFFREY MARK GODFREY, ESQ.
5
   For Apple, INC.:
6                       Wilmer Cutler Pickering Hale
                          & Dorr LLP
7                       950 Page Mill Road
                        Palo Alto, California 94304
8                  BY:  MARK D. SELWYN, ESQ.

9  For AT&T:
                        Baker Botts
10                      2001 Ross Avenue
                        Dallas, Texas 75201
11                 BY:  KURT PANKRATZ, ESQ.

12                 BY:  DAVID CLONTS, ESQ.

13 For Amazon.com, Inc.:
                        Klarquist Sparkman, LLP
14                      One World Trade Center
                        1212 Southwest Salmon Street
15                      Suite 1600
                        Portland, Oregon 97204
16                 BY:  ROBERT T. CRUZEN, ESQ.

17 For HTC and AT&T:
                        Akin, Gump, Strauss, Hauer
18                        & Feld-Austin
                        300 West 6th Street
19                      Suite 1900
                        Austin, Texas 78701
20                 BY:  FRED WILLIAMS, ESQ.

21                      Transcribed by:
                        Echo Reporting, Inc.
22                      Contracted Court Reporter/
                        Transcriber
23                      echoreporting@yahoo.com

24

25

1  P-R-O-C-E-E-D-I-N-G-S

2                    --oOo--

3          THE CLERK:  Calling Adaptix, Inc. versus Dell,

4  Inc. et al, Case Number CV14-1259-PSG and related cases.

5      Counsel, please state your appearances.

6          THE COURT:  Good afternoon everyone or good

7  evening, I should say.

8          Mr. Foster, would you like to begin?

9          MR. FOSTER:  James Foster for Adaptix, your Honor.

10         MR. SELWYN:  Good afternoon, your Honor.  Mark

11 Selwyn for Apple.

12         MR. PANKRATZ:  Good afternoon.  Kurt Pankratz on

13 behalf of AT and T.

14         MR. WILLIAMS:  Your Honor, Fred Williams for HTC

15 and AT and T.

16         MR. MAHON:  Your Honor, James Mahon for Sony

17 Mobile.

18         MR. GODFREY:  Good afternoon, your Honor.  Geoff

19 Godfrey for Verizon Wireless.

20         MR. CRUZEN:  Good afternoon, your Honor.  Bob

21 Cruzen for Amazon.com.

22         THE COURT:  Good afternoon to each of you.  I

23 understand we have at least one attorney appearing by

24 telephone on Court Call, is that right?

1          MR. CLONTS (telephonic):  Yes, your Honor.  This
2  is David Clonts for AT and T.

3          THE COURT:  Good afternoon.  Welcome.  Please have
4  a seat, everyone.

5          MR. CLONTS:  Good afternoon.

6          MR. FOSTER:  Your Honor, I have an announcement.

7          THE COURT:  Yes, Mr. Foster.

8          MR. FOSTER:  I'd like to thank Judge Cousins, but
9  it appears that Sony and Adaptix have worked out a
10  settlement.  So the Sony motions will be off calendar today
11  if that's all right with your Honor.  And if your Honor will
12  excuse Mr. Mahon.  He has to go to Judge Cousins to work out
13  the language before everybody leaves.

14          MR. MAHON:  Yes, your Honor, that's correct.  We
15  have reached a settlement in principle, and we are working
16  on the terms sheet now to get that done today with Judge
17  Cousins.

18          THE COURT:  Terrific.  Well, let me also express
19  my appreciation to Judge Cousins for his work today.  Let me
20  also observe that perhaps I ought to go longer in other
21  cases more often.  I appreciate your efforts to make this
22  time productive, and I do appreciate your efforts in
23  resolving the case.  If you need any help from me, let me
24  know.  Otherwise, you're certainly excused to go do whatever
25  you need to do with Judge Cousins.

1          MR. MAHON:  Okay.  So I assume our two motions are

2    now off the calendar for today.

3          THE COURT:  Your assumption is correct.  They are

4    off calendar.

5          MR. MAHON:  Thank you very much, your Honor.

6          THE COURT:  Thank you.  All right.

7       Let's turn to the matters that remain.  And, as I

8    understand it from a letter that I received, I think it was

9    on November 16th, the parties have worked out a proposed

10   order.

11      Let me just say this before we turn to the motions that

12   remain.  As far as I'm concerned, you all have been very

13   patient with me, and so I'm happy and eager to give you

14   whatever time you need today and tonight to hear these

15   motions properly.  At the same time, I recognize it's been a

16   long afternoon for you all and you've been sitting around,

17   hopefully making some productive use of the time.  So I give

18   you two options.  If you can all agree on it, great.  If

19   not, we'll just do what I think is best.

20      One is to plow through these motions now and stay as

21   late as we need to to get them resolved.  The other is if

22   you have some pressing commitments this evening, I'm happy

23   to have you back tomorrow and hear this either live or by

24   telephone.  I'd just as soon get this done and get done

25   tonight.  Do you all agree?  All right.  Terrific.

1    UNIDENTIFIED SPEAKER:  I'm traveling.  I'm --

2    THE COURT:  Then let's stick with what we've got

3 and do the best that we can.

4    If I'm right, Sony's motion was set to be heard last.

5 So why don't we turn to Adaptix's Rule 52 and 59 motion to

6 alter judgment.  Mr. Foster, go ahead, sir.

7    MR. FOSTER:  One other announcement before we do

8 that, your Honor.  Sony and Kyocera have reached an

9 agreement in principle.  Kyocera should have been filing

10 today, but it hasn't come across the -- my E-mail yet -- ECF

11 filing a request for a stay of the action to give the

12 parties until December 18th to finalize the settlement.

13 Just so you know.

14    THE COURT:  Thank you for letting me know.

15    MR. FOSTER:  Now I have some slides.

16    THE COURT:  All right.

17    MR. FOSTER:  Give this to Mr. Rivera?

18    THE COURT:  If you would please.  Thank you.

19    MR. FOSTER:  I've cut down on the number of

20 slides, your Honor, because I've covered most of this area

21 at some point.  So I understand the first motion to be

22 argued and there are issues that some of the issues go

23 across a number of different motions.  So I'm just going to

24 argue an issue once, and if it --

25    THE COURT:  I appreciate that.

1          MR. FOSTER:  Unless you want me to do it later.

2    The first issue and the one which is the only issue in the

3    first case is what I call the _Dow_ issue.  This is the issue

4    of whether there's a temporal limitation on claim

5    preclusion.  And, again, I'm going to not race through it

6    but not dwell on any of these points, particularly the ones

7    I've covered before.

8          THE COURT:  I take it, Mr. Foster, you think _Dow_

9    does change things?

10         MR. FOSTER:  Your Honor, yes, it does.  I think it

11   -- the way I read _Dow_, it reenforces an argument we've made

12   before, and that is that there is a temporal limitation on

13   the claim preclusion.

14         THE COURT:  Go ahead.

15         MR. FOSTER:  But, again, I won't take too long

16   with this argument, but I think there are a couple of

17   important points to make.  The first sheet -- and this is

18   central -- central -- and I have a hard time explaining

19   claim preclusion to the younger people in my office because

20   they tend to confuse it with issue preclusion, and what I

21   say here is that issue preclusion, if you argue it once and

22   you lose, you can't do it again.  Claim preclusion is for

23   the issues that aren't argued, were left out for whatever

24   reason, and it doesn't matter whether you won or lose the

25   issues that were argued because you didn't litigate an

1 issue, you can't get into it again.  The idea is to

2 encourage that the entire claim is handled in one suit.

3      And, specifically in this case -- oh, by the way, the

4 briefing on appeal was completed this past week.

5           THE COURT:  I was going to ask.  Thanks for

6 telling me.  Okay.

7           MR. FOSTER:  I think only days ago.  We have done

8 some study into the Federal Circuit's calendar and

9 practices.  It's reasonable to expect the case will be

10 called for argument in about three months.  Again, charting

11 precedential decisions, it would be reasonable to expect a

12 decision in this appeal about the middle of this summer.  Of

13 course, if it's a Rule 36 affirmance, it would make them

14 more quickly than that.

15      So the point is that whatever the Federal Circuit does

16 in this should not affect claim preclusion.  Claim

17 preclusion is the issues not litigated.

18      So, on the next sheet we outlined the conflict between

19 your decision of August 21 and the language of _Dow_.  You're

20 quite clear that -- well, you know what you said, and _Dow_

21 says the doctrine of claim preclusion does not apply as

22 between the claims for the first and second damages periods.

23 So you've read _Dow_ by this time.  I don't need to get into

24 that.

25      The next slide is -- is a prelude to what my major

1  argument is.  As I read the briefing on this motion, I don't

2  see Defendants as really disputing that Dow's holding as to

3  claim preclusion overrules this Court's position that claim

4  preclusion has no temporal limitation.  They are only

5  arguing that this Court should disregard Dow as you've

6  disregarded other decisions in the past, citing the Newal

7  (phonetic) principles.

8      I don't read the Defendants as arguing that the use of

9  the term "claim preclusion" was not a mistake by Judge Rader

10 in the Nystrom opinion, and what I did notice when I read

11 their briefing was they scrupulously avoided responding to

12 anything we said in our papers about the various Federal

13 Circuit decisions applying the Newal principles.

14     So which brings me to my concluding argument on this

15 point, and that's the next page.  I think what we need to do

16 is look at what will happen at the Federal Circuit.  I mean,

17 we've made our motion.  You can deny it.  Okay.  But what

18 will happen when this case gets to the Federal Circuit,

19 well, they say there has to be an en banc hearing.  Let's

20 suppose the Federal Circuit -- that's 12 people -- sit down.

21 What's going to happen to their argument?  In their briefing

22 they didn't really defend what Judge Rader said or -- I

23 mean, occasion there are issues which are -- there's a huge

24 gap in the profession.  There's something to be argued.  I

25 gave an example the last time I was here about claims where

products were defined by the process of making them then. To our part the Federal Circuits were a couple of years before they finally resolved it.

This isn't that, and at an event hearing, what would happen, they would have to come up with some argument to defend what I'll call the Nystrom position, but they haven't put any of those arguments in their briefings here. So I wonder whether the Federal Circuit would even let them do that. The Federal Circuit, I would suspect at the en banc hearing would note that the language in Nystrom was a mistake, that Aspex dealt with that, and they would cite the authority -- the judges would cite the authority in Dow, Aspex, and Brain Life, and I don't know what the argument would be, and maybe I'll hear it today from my talented opponents. But, realistically, the Federal Circuit is not going to -- in my view, is not going to schedule this for an en banc hearing. They'll assign it to a panel. The panel will show up. They'll cite CFC cases that we cite in our briefs. They'll cite the Newal business. They may even pick up the fact that the earlier Foster cases actually went the way we said they did. And I don't know what the counsel is going to do to defend that for the panel, but that's me projecting what will happen, and I think the most important sheet is we have to look at what's going to happen in the Federal Circuit.

1    If your Honor can deny my motion and see what happens,

2 but if -- if your Honor feels as I do that the Federal

3 Circuit -- it's a foregone conclusion what they're going to

4 do, maybe we can save them that issue, but I'll leave that

5 for the Court, and I'll turn the microphone over to my

6 adversary.

7         THE COURT:  Thank you, Mr. Foster.

8    Mr. Selwyn, good evening.

9         MR. SELWYN:  Good afternoon, your Honor.

10    Your Honor, we are here today on Adaptix's Rule 52 and

11 Rule 59 motion, and I emphasize that because the procedural

12 posture is quite important, and it goes to one of the

13 reasons the motion must be denied.

14    First, neither Rule 59 nor Rule 52 provides a basis for

15 the Court to alter or amend its judgments and, second, Dow

16 Chemical does not change the law in any way relevant to

17 claim preclusion.

18    Let me first address the important procedural issue

19 here.  Rule 59(e) authorizes a Court to "alter or amend" a

20 judgment.  In this case, the Court granted the Defendant's

21 motion to dismiss on two independent grounds.  First, claim

22 preclusion and, second, the Kessler Doctrine.

23    Adaptix's motion is expressly not directed to the

24 Kessler Doctrine.  Adaptix says that on page seven of its

25 opening motion.  So even if the Court were to decide that

<u>Dow Chemical</u> change the law in a way material to the claim preclusion issue, which it did not, the Court would still have no cause to alter or amend its judgment here as they would still be fully and independently supported by the Kessler Doctrine.

THE COURT: Right. So, Mr. Selwyn, one of the things the scope of my judgment and its impact or effect is not dependent any way upon which of these two grounds. Either way, the judgment should stand. Is that what you're saying?

MR. SELWYN: That's exactly right. Your Honor said -- addressed each of those and expressly held that each was an independent basis for your Court's ruling dismissing -- granting the motion to dismiss and granting judgment in Defendant's favor.

Adaptix seems to seek for the Court to reconsider the reasoning of its decision insofar as it granted the motion to dismiss based on claim preclusion. But Rule 59(e) is not a proper vehicle to do so here because even if the Court were to find merit in Adaptix's argument regarding claim preclusion, the judgments closing the case would remain unaffected.

Adaptix also refers to Rule 52(b) in its moving papers, although it does so quite fleetingly. Rule 52(b) also provides no procedural basis for the Court to alter or amend

1   its judgments here.  Rule 52(b) is directed to allowing the

2   Court to amend its findings of fact or make new findings of

3   fact following a bench trial.  In this case, of course, the

4   Court granted judgment under Rule 12.  There was no bench

5   trial.  There was no -- there were no findings of fact.

6   Rule 52(b) simply has no application under these

7   circumstances, and --

8           THE COURT:  Mr. Selwyn, I'm sorry for interrupting

9   you, sir.  You raise an interesting procedural question.

10  Let's put Rule 52 to the side for a moment, and let's focus

11  on Rule 59.  If I hear you right, as you've already

12  explained now a couple of times, because my judgment had two

13  independent bases, even if I were inclined to agree with Mr.

14  Foster as to one of those bases or grounds because the other

15  independent bases or grounds would stand, the judgment

16  should not be affected, would not be affected, and no -- no

17  relief could properly be granted, right?

18          MR. SELWYN:  That's right.

19          THE COURT:  If I accept that additional point, am

20  I precluded in any way from "fixing" a problem that I might

21  see if I read Dow as changing the state of the law?  In

22  other words, do I have any procedural mechanisms to address

23  new case law from the Federal Circuit that might impact one

24  of two independent grounds for a judgment?  Do you have any

25  thoughts about that?

1    MR. SELWYN:  Well, that doesn't change a lot, but

2  if we posit for the sake of --

3    THE COURT:  I appreciate that.

4    MR. SELWYN:  -- argument that it -- that it would,

5  I think the answer to your question is no.  In this

6  circumstance, you would not have any opportunity --

7    THE COURT:  Okay.

8    MR. SELWYN:  -- to do that.  And we discussed that

9  at some length at pages three and four of our brief, that in

10  a case where the Court is being asked to reconsider its

11  reasoning but not the judgment, Rule 59(e) is, in fact, not

12  the right vehicle.

13    THE COURT:  Right.

14    MR. SELWYN:  Because there is a distinction

15  between the Court's decision on the one hand and the Court's

16  judgment on the other.

17    THE COURT:  Right.  Presumably, my judgments could

18  stand even if my reasoning were extremely terse.  It might

19  not get me brownie points at the Federal Circuit to just

20  issue a one or two-line decision supporting -- or explaining

21  that judgment, but the alternative you point to is

22  presumably governed by our Local Rules, right?  So to the

23  extent the Court wished to reconsider an opinion or decision

24  separate and apart from a judgment, there are mechanisms

25  under our Local Rules for doing so, but they're rather

1 limited, right, new case law, new facts, manifest injustice,

2 that sort of thing?

3        MR. SELWYN:  That's correct.  And the Ninth

4 Circuit and the Federal Circuit have made clear that Rule

5 59(e) is an extraordinary remedy, to use their terms.  It's

6 not a vehicle for reconsideration by the Court of the same

7 arguments that were already heard, as this case, on the

8 underlying motion.

9        THE COURT:  Right.  It's not even for a -- as they

10 say, the -- a change of heart.

11        MR. SELWYN:  Correct.

12        THE COURT:  Okay.  Go ahead.

13        MR. SELWYN:  So, simply put, the Court should deny

14 Adaptix's motion because its arguments do not properly fall

15 within either of the two rules that it has invoked, but even

16 if Rule 59 or Rule 52 provided a basis for the Court to

17 reconsider one of the grounds on which its judgment was

18 based, Adaptix's motion would fare no better either.  Dow

19 Chemical did not bring about any change in the law regarding

20 claim preclusion.  Under Adaptix's reading of Dow Chemical,

21 the case simply followed the approach to claim preclusion

22 that the Federal Circuit had followed in Brain Life and then

23 Aspex.  But just as in Brain Life and Aspex could not

24 overrule the Federal Circuit's earlier decisions in Nystrom,

25 in Foster and in Hallco, as this Court's found in its

1   decision granting the Defendants' motion to dismiss, so too

2   Dow Chemical cannot overrule those prior cases.

3           THE COURT:  So that even if it were inconsistent

4   with Nystrom, your view is, as I have explained myself in my

5   opinion, that we're stuck with Nystrom right or wrong?

6           MR. SELWYN:  That's exactly right.  On the bottom

7   of page 14 in your Honor's decision you wrote:

8                   "Unless and until the Federal

9                   Circuit sits en banc to resolve any

10                  inconsistency between the principals

11                  elaborated in Nystrom and those of

12                  Aspex, the earlier ruling trumps."

13      Your Honor could just as easily substitute Dow Chemical

14  in that sentence for Aspex, and your Honor's ruling would

15  still remain the same.

16          THE COURT:  Are you aware, Mr. Selwyn, of any

17  other case that is before the Federal Circuit that might

18  offer the Federal Circuit an opportunity?  I'm happy to give

19  them that chance if they choose to pursue it, but are you

20  aware of any such opportunity that might predate that?

21          MR. SELWYN:  I'm not aware of one.  It's not to

22  say that there isn't one, but I'm not aware of it.

23          THE COURT:  I understand.

24          MR. SELWYN:  So, in short, Dow Chemical does not

25  represent an intervening change of controlling law or in any

way alter the intra-circuit conflict on the claim preclusion

issue that the Court has already recognized in reaching its

decision granting the motion to dismiss and entering

judgment for the Defendants.

Dow Chemical at most means that the intra-circuit

conflict is now evenly divided.  We have three decisions on

one hand, and we have three decisions on the other, and the

parties addressed this intra-circuit conflict at length in

the underlying briefing to the motion to dismiss.  We

addressed it at length in -- before your Honor at the

hearing, and, most importantly, your Honor addressed this

issue precisely in its decision granting the motion to

dismiss.  There's nothing in Dow Chemical that alters that

decision.

And then just finally to address Mr. Foster's slide

about what Defendants do not dispute.  We do dispute these

things.  They were discussed at length in the underlying

briefing.  Just to take one example, the slide says

Defendants do not dispute Nystrom's use of the term "claim

preclusion" was a mistake.  Well, in fact, we addressed at

length in our reply brief this issue, and to quote, we

wrote:

"Not only does Nystrom repeatedly

mention claim preclusion and res

judicata without any reference to issue

1          preclusion, but issue preclusion could

2          not have barred <u>Nystrom's</u> claim because

3          he asserted a different theory," and so

4          forth.

5     So certain things were not addressed because they were

6 addressed below.  They were precisely considered by your

7 Honor.  They were rejected in granting the motion to

8 dismiss.

9          THE COURT:  All right.

10          MR. SELWYN:  Thank you.

11          THE COURT:  Thank you, Mr. Selwyn.

12     Mr. Foster, any rebuttal?

13          MR. FOSTER:  Briefly, please.

14          THE COURT:  Go ahead.

15          MR. FOSTER:  As your Honor is aware, the same

16 issue was presented in the wave four cases.

17          THE COURT:  Yes.

18          MR. FOSTER:  And so it is appropriate for Rule 59

19 treatment in those cases that, frankly, since your Honor

20 asked to get into this and do whatever you're going to do

21 with it, it didn't seem to make any sense for you to reach

22 inconsistent results in one case and not the other.  So we

23 put it in this case as well.

24     I agree with my colleague that it's -- Rule 59 is not

25 the right vehicle for his case, but Rule 52 is, and we have

a footnote saying Rule 52 is the proper procedural issue.
But if you come out the same way, it doesn't really matter.
But if you come out our way in the wave four cases, it looks
kind of dopey if you're saying two different things.

THE COURT: Wouldn't be the first time I've been
accused of that. All right. I think I understand your
positions.

Let's turn to the next motion. Unless there's anything
else you wish to ask on the wave four argument, I'd just as
soon turn to the motion for clarification. Mr. Foster?

MR. FOSTER: Well --

THE COURT: If you have other arguments --

MR. FOSTER: -- wave four is just a --

THE COURT: Go ahead.

MR. FOSTER: Again, this is the next tab. I'm not
going to spend a lot of time on this, but the Defendants
raised it. Obviously the big issue in wave four is the
temporal issue. We had a few things in our first slide or
two to indicate that temporality issue should be treated
identically for wave four as it is in any other context.
But they also raise two other issues. They talk about an
Icon IP case, and what we put in our slides here is -- is
the Icon IP case is okay. There what happened in those
cases all the things were prefiling acts of infringement,
and so Icon IP is not at all inconsistent with the position

1 that we're taking here. But it's all in the slides, and I
2 don't need to get into that.

3 Finally, I do want to say something about the
4 collateral attack.

5 THE COURT: Yeah.

6 MR. FOSTER: An attack means, boy, the judge got
7 it wrong. That's not what we're -- that attack is what we
8 take up to the Appellate Court. When we file something with
9 you, it's not an attack, and it's not collateral because
10 you're the judge. But I do point out on the next couple of
11 slides -- and we've shown you these before -- the authority
12 in the Ninth Circuit is that if the party is penalized in
13 the first case, as you penalized us, it would be wrong to
14 throw out the second case for the reasons that's set forth
15 there in the Adams and I think the Addison cases.

16 That's all I have to say on wave four, and now do you
17 want me to move on to the motion for clarification?

18 THE COURT: Well, why don't we hear from the
19 Defendants on wave four, and then we'll keep going down the
20 list. Does anybody wish to speak to wave four?

21 UNIDENTIFIED SPEAKER: I'll start with 10 seconds
22 on behalf of AT and T. I think the issues, your Honor, are
23 identical, as you pointed out, to the motion that Mr. Selwyn
24 addressed, and so for all the reasons that he articulated,
25 we believe that Adaptix's motion should be denied here.

1          THE COURT:  Nothing wrong with a succinct

2   argument.  Mr. Cruzen, do you have anything?

3          MR. CRUZEN:  I'll try and follow suit, your Honor.

4          THE COURT:  Okay.

5          MR. CRUZEN:  I think one difference about claims

6   pleadings argument that is -- distinguishes it from the Dow

7   case, Brain Life, Aspex Eyewear, Adaptix tried to sue in two

8   simultaneous cases the same products on the same patents.  A

9   number of cases dealt with that.  You can see they got an

10  adverse ruling on the motion to amend the infringement

11  contentions, then turned around and filed a new suit the

12  next day.  If that were permitted, you could have serial

13  suits filed every time somebody got an adverse ruling.  We

14  don't think that would serve the interests of judicial

15  efficiency or consistency in jury verdicts because you can

16  imagine you could get conflicting decisions in these

17  simultaneously pending suits.  So just one more reason we

18  think --

19          THE COURT:  Just on that last point, Mr. Cruzen,

20  because it's something I've been thinking about.  I meant it

21  when I said I was eager to hear from you all today because

22  these issues continue to fascinate me.  If -- if I

23  understand your point correctly, what you're basically

24  saying is in these situations, if a Plaintiff, for example,

25  brings a motion to amend and the Court dismisses it for lack

of diligence let's just say, what you're saying effectively
is they're out of luck.  They should understand that when
they engage in that type of lack of diligence or suffer from
-- they are going to pay a price for that, not just in this
case but in cases that follow.  Is that fair?

MR. CRUZEN:  I think that's correct, your Honor,
and that is what happened in the Icon case.  I think maybe
there's a different situation where if you're on the eve of
trial, a motion to amend is denied for undue prejudice
because the defense wouldn't -- that's a different
situation, but for diligence I think that just stands for
the reason.  And one other point I should mention is Adaptix
relied upon this legal fiction that they never intended to
pursue post-Wave Two filing damages.  To say that there are
really two distinct periods, they litigated the case for two
years seeking damages post filing of the Wave Two complaint.
And so if the Court rejects that fact, that little fiction,
I think their argument fails for that reason.

THE COURT:  All right.  The last question on this
one is I for the life of me can't remember as I sit here, in
denying the motion for leave to amend, did I address both
prejudice and diligence or diligence alone?

MR. CRUZEN:  You addressed both, your Honor.  I
think on the prejudice, your Honor, at least one basis was
that some Defendants (indiscernible) were deprived of the

1 opportunity to file an IPR.

2          THE COURT:  That's right.  That's right.  Okay.  I

3 think I have it.  Thank you.

4      Mr. Foster, any rebuttal or, if you want to, you can

5 turn to --

6          MR. FOSTER:  I can't speak for all the decisions.

7 I know at least one you said you don't have to reach the

8 issue of prejudice because you found that we weren't

9 diligent.

10     You know, there was one case where the prejudice was

11 they didn't file an IPR, and we kind of ridiculed that, but

12 okay.  That -- you did reach prejudice in that.

13         THE COURT:  Okay.  Thank you.  Shall we turn

14 then -- let's turn to clarification.

15         MR. FOSTER:  So these were the wave two cases

16 which, I don't know, maybe your Honor did intend to dismiss

17 them, but if that was your intention, the Federal Circuit

18 would probably benefit by a little more discussion of the

19 reasons, as would the parties.

20     So I briefed what appear to be two issues which I think

21 are unique to the wave two cases.  First is whether the

22 Kessler Doctrine -- and your views on the Kessler Doctrine

23 are what they are, and I should have said this before.

24 There are certain things that you decided we are not taking

25 up today.  We'll take them up -- we take them up with the

Federal Circuit, including your handling of the Kessler
ground and the Apple cases, and that's fine.  But the second
Kessler issue we do take up today it says the Kessler
Doctrine once it's invoked as a reply to a competitor's
products, and that issue is -- does come to the front when
you're talking about Dell and Amazon and these other parties
that weren't there.

So I looked into the cases.  The first problem, let's
talk for a minute or two about what Kessler is.  So we have
this elaborate law of preclusion which has been developed
over the years by the lawsuit, blah, blah, blah, claim
preclusion, issue preclusion, and it's very ornate and well
reasoned.  Then there's this Kessler decision that happened
a long time ago, and the Federal Circuit has decided to keep
it around to give some kind of effect.  But the problem with
-- with that is -- and, of course, that's your decision, is
that in some ways it's inconsistent with the process that's
been set up, and so what district courts have to do in the
first instance is figure out, well, okay, what do we do with
that.  And the problem we end up with is a lot of
arbitrariness which is difficult to explain in the total
scheme of things.  So the request for this Court is, "All
right.  Recognizing there is some arbitrariness, where do we
draw these lines?"  And we litigants are faced with the same
issue.  It's kind of hard to come up with a theory because

1  the theory which governs cases generally isn't consistent

2  with what we see in the Kessler case.

3      So the question as to arbitrariness today is, well, you

4  got Kessler.  Do you extend it to competitors' products.

5  The best we can do is go back to cases that were decided by

6  the Supreme Court way back then, and this fascinated me.

7  The Goodyear cases, now, Goodyear got a judgment that a

8  patent wasn't valid.  This is before Blonder-Tongue

9  (phonetic).  So what happened is -- and that went to final

10 final and appeals were exhausted.  Then somebody else raised

11 the argument, and the Court there found, well, no, the

12 patent's perfectly valid, and that got upheld.

13     So the way the courts worked it out, they say, well,

14 okay, the patent's value, you can sue on it, but Goodyear

15 has a free pass.  They have a -- what's the word, claim -- I

16 forget, trade right.  And so the patent owner then tried

17 suing various people, and he sued companies that had bought

18 their materials from Goodyear and then used the materials to

19 make the same product that Goodyear was making.

20         THE COURT:  What was the product?  I assume we're

21 talking about tires.  Was the downstream producer a tire --

22         MR. FOSTER:  Something --

23         THE COURT:  -- manufacturer?  I'm just trying to

24 think --

25         MR. FOSTER:  Some kind of tire setup.  I know when

1 I was here before I actually got a picture from the

2 patent --

3          THE COURT:  Okay.  In any event, I --

4          MR. FOSTER:  -- of the patent that I showed you.

5          THE COURT:  -- I take your point.

6          MR. FOSTER:  But -- but, yeah, and the claims were

7 -- the claims involved in these three cases were the

8 manufacturer of the product, and because these people buying

9 the materials and Goodyear was manufacturing it, well, they

10 didn't get the benefit of the trade right.  And so we argued

11 in our briefing, well, if they don't and they buy the stuff,

12 why should a competitor of theirs get the trade right.

13     But, as I read and preparing to argue today I went back

14 and read carefully all of the briefing in this case, and I

15 didn't really see anybody arguing that Sony, for instance,

16 gets the trade right.  The argument that was being made in

17 these briefs are that the carriers get the trade right

18 because the carriers here, AT and T and Verizon, were

19 victorious before your Honor.  So, therefore, they're

20 entitled to trade.

21     Well, then the question, okay, you got to trade, right,

22 at least under your application of Kessler doesn't extend to

23 products that were involved in the first case, products of

24 other manufacturers.  I don't have 50 cases in this.  I just

25 have Brain Life where the actual entity that won the first

1 case did not get a _Kessler_ right to a product that they were

2 now selling, even though it's similar -- it might be

3 identical -- because they purchased it from somebody else.

4     Well, I don't know how to distinguish that from the

5 Sony products or the Dell products which were not involved.

6 Again, I can't come up with a sophisticated theory because

7 _Kessler_ is just kind of an arbitrary thing which sits in the

8 middle of this.  All I can say is we have one case from the

9 Federal Circuit, a case which, frankly, you relied upon in

10 your interpretation of _Kessler_, and if you're going to rely

11 upon this case, I think you have to go in that direction.

12 So that's the _Kessler_ argument.

13     The other argument with respect to claim preclusion

14 isn't really invoked by this particular motion.  So I'll

15 save that for the next motion.

16         THE COURT:  Thank you, Mr. Foster.

17     Who wants to respond to this one?

18         MR. PANKRATZ:  Your Honor, Kurt Pankratz on behalf

19 of AT and T.  And since he addressed just the _Kessler_ issue,

20 I'll do the same.

21         THE COURT:  Sure.

22         MR. PANKRATZ:  This presents the exact situation

23 here with respect to AT and T, Verizon and Verizon that

24 _Kessler_ is designed to prohibit, which is serial lawsuits

25 accusing the exact same thing of infringement, and there is

1 no dispute here, your Honor, in your order. They don't

2 dispute it. It is identical infringement allegations. It's

3 based on the standard. That's what's accused of

4 infringement.

5          THE COURT: Mr. Pankratz, can I just ask you is it

6 -- if I've erred previously, I apologize, and I want to make

7 sure I don't err in the future. Is it proper for me to

8 characterize or even just understand that AT and T, for

9 example, is a customer of one of the handset manufacturers

10 in the -- in the Kessler sense of that word or is that not

11 accurate?

12          MR. PANKRATZ: I don't think that would be the

13 right way to characterize it because, frankly, Kessler

14 starts with the victorious party, and the victorious party

15 here is AT and T and Verizon.

16          THE COURT: Right.

17          MR. PANKRATZ: And so I don't think it's proper to

18 characterize them as the customers.

19          THE COURT: Because AT and T and Verizon were part

20 of wave one as opposed to --

21          MR. PANKRATZ: Correct.

22          THE COURT: -- in Kessler the party seeking to

23 invoke the benefit of the doctrine was not in the First

24 District Court case, right?

25          MR. PANKRATZ: That's exactly right, your Honor.

1          THE COURT:  Okay.

2          MR. PANKRATZ:  And that's -- in the -- in the <u>Goodyear</u>

3   cases, he was talking about it was a customer.  It was a

4   downstream person who hadn't even purchased the built radial

5   tires.  They just purchased some rubber, and then they themselves

6   manufactured what was the infringing product, and the Court in

7   those three very tightly related cases said you don't get a -- you

8   don't downstream get a right just because you bought some rubber

9   from Goodyear.  You have to buy the actual built tire.  They don't

10  go into --

11         THE COURT:  Understood.  And, again, it's certainly the

12  case that in those Goodyear cases, the customer that purchased the

13  rubber was not a named defendant in the first case against

14  Goodyear proper, right?

15         MR. PANKRATZ:  That's correct.

16         THE COURT:  Okay.

17         MR. PANKRATZ:  That is correct.  So here the <u>Kessler</u>

18  doctrine starts with the victorious Defendant, and that's AT and

19  T.  That's Verizon.  They have the trade right, and the test, he

20  -- Mr. Foster said that we don't have this built up, established

21  test, but the test for the <u>Kessler</u> doctrine is actually, in my

22  view, borrowed from claim preclusion.  It is the same or

23  essentially the same.  It looks to is there a material difference

24  between the products with respect to infringement.  There's no

25  dispute here.  It is the 4G LTE standard that is accused of

infringement. AT and T should be able to continue selling 4G LTE compatible devices without fear that there's some arbitrary line between where a new device can be accused based on the exact same infringement allegations that AT and T and Verison --

THE COURT: When you say that the accused products here are similar -- are substantially similar in the same way as was the case in Kessler, I think we've talked about this in one earlier hearing or more. I assume what you're saying is similarity as measured by the relevant functionality, and the functionality that gives rise to the infringement allegations?

MR. PANKRATZ: Yes. Yes, your Honor.

THE COURT: Okay.

MR. PANKRATZ: And I believe there is no dispute. The infringement allegations across all the cases are virtually cut and paste identical. There is nothing manufacturer specific in a single one of those except maybe a footnote here or there.

THE COURT: Right.

MR. PANKRATZ: They are identical allegations.

THE COURT: I'm not suggesting this is the case here, but, for example, if the phones in the later wave were flip phones and the phones in the earlier wave were smartphones, but they all were LTE 4G standard compatible phones, that other characteristic would not be part of the assessment or measure of similarity for purposes of Kessler, right?

MR. PANKRATZ: In this case, that's correct.

1          THE COURT:  Okay.  Understood.

2          MR. PANKRATZ:  Certainly if the patents involved how

3  you picked up and answered the phones --

4          THE COURT:  Right.

5          MR. PANKRATZ:  -- there may be a different analysis.

6          THE COURT:  Okay.  All right.  I think I have it, Mr.

7  Pankratz.  Thank you.

8          MR. PANKRATZ:  Thank you.

9          THE COURT:  Mr. Foster, anything else on this one?

10          MR. FOSTER:  I don't think so, your Honor.  The

11  questions you were asking my colleagues about were not arguments

12  we were relying upon, although I know the cases that they were

13  talking about.  Again, I didn't hear them say anything about Brain

14  Life.  So I have nothing to respond to.

15          THE COURT:  All right.  Thank you, Mr. Foster.

16          MR. PANKRATZ:  I will --

17          THE COURT:  Sure.  You've been waiting all afternoon.

18  I want to give each of you the opportunity.

19          MR. PANKRATZ:  Very briefly.  He did raise the issue of

20  the -- I believe it was the ERGO Plus Plus product.  He didn't

21  name it specifically, but after the first case in Brain Life,

22  there were a number of additional products that the accused

23  Defendant was selling.  It included a number of follow-on devices,

24  and then it also included this ERGO Plus Plus, which was

25  apparently they bought a company and brought that product in.

There's not a lot of discussion on this, but basically the Federal Circuit says that there were no infringement allegations ever against this product and we need to send it back down to the District Court for more -- for more factual gathering.

THE COURT: I don't suppose you know what the District Court did with that. That's Judge Hamilton's case, right?

MR. PANKRATZ: I believe so, but I don't know, your Honor.

THE COURT: I don't know either. I was just curious.

MR. PANKRATZ: I mean, I'm now going to go back and look, but the -- because the ERGO Plus Plus was never addressed, it was sent back. The test here, if you apply the same or essentially the same here, there is no factual dispute. They have agreed. The accusations are on the 4G LTE standard. There is no manufacturer specific issue here.

THE COURT: Does anybody know is Brain Life a Northern District Case? Did I manage to stump you all at 5:05? It's not material. So I don't want you to spend any more time on it than necessary, but if while we're debating this anyone could refresh my memory, I would appreciate it. I know it's either Northern or Southern District of California.

Mr. Godfrey? Judge Bencivengo's case?

MR. GODFREY: Yes.

THE COURT: This is how I tend to keep these cases straight. I think I have it, Mr. Pankratz.

1          MR. PANKRATZ:  That's all I have.  Thank you.

2          THE COURT:  Thank you.

3          MR. FOSTER:  Do I get my rebuttal now, your Honor?

4          THE COURT:  You do.  Now that you've heard the

5  argument, Mr. Foster, you do get a rebuttal.

6          MR. FOSTER:  <u>Brain Life</u>, Cathy N. Bencivengo, Southern

7  District of California.

8      So what I want to say about <u>Brain</u>, like I say, like in law

9  school there are some cases sui generis.  Everybody argues about

10 which way you go on that.  This is an arbitrary hearing.  What

11 happens in <u>Brain Life</u>, the language is the -- the Court talks

12 about how the -- you know, not that the product's different but

13 that they acquired it from somebody else.  So it wasn't the

14 subject of the earlier claims.  And this was the victorious entity

15 where there's some -- I recognize that even for a party that has a

16 trade right, if they come out with a different product, then

17 they're okay.  But that wasn't the basis.  It was because it was

18 not -- not the subject of the earlier case.  And I have to remind

19 the Court that the Sony products, the Dell products were also not

20 the subject of the other case.  They may, in fact, be similar.  If

21 this were an issue preclusion case, that would be waived, but I

22 think the <u>Brain Life</u> court also allowed that the products might be

23 quite similar as well.

24

25         THE COURT:  All right.  Thank you, Mr. Foster.

1    Unless there's anything else on this one, why don't we turn

2 to the next motion which I believe is AT and T, Verizon, and HTC's

3 motion for judgment on the pleadings.

4    Mr. Williams, good evening.

5         MR. WILLIAMS:  Good evening, your Honor.  At the risk

6 of hearing I'm going to be brief, real brief.  I think --

7         THE COURT:  Take whatever time you need.  Go ahead.

8         MR. WILLIAMS:  Thank you, your Honor.  I think this

9 motion rises or falls with what the Court decides on the Rule 52,

10 59 motion.  There's not a whole lot more to add on this one.

11         THE COURT:  Do you see any daylight at all between the

12 issue in this case and the issue that Mr. Selwyn argued?

13         MR. WILLIAMS:  That we just talked about?  Oh, that Mr.

14 Selwyn talked about?

15         THE COURT:  Yeah.  I tend to agree with you that I -- I

16 certainly could not identify any way to rule one way in their case

17 and another way in yours, but I want to make sure.

18         MR. WILLIAMS:  All of the phones that were at issue in

19 the wave three cases against HTC, involving HTC phones are also

20 accused in this -- in these cases, the wave two cases.  There's

21 perfect overlap of phones.  It's the same parties.  As -- as Mr.

22 Foster admits in his opposition, unless the Court changes its mind

23 on Kessler, these cases should be dismissed.

24         THE COURT:  Thank you.  Appreciate it, Mr. Williams.

25    Mr. Foster?

1          MR. FOSTER:  We've said it in our papers, your Honor.

2 We see this just like the wave three case, and we expect you'll

3 treat it just as the wave three case, but since we had made a

4 motion in the other cases directed towards one of the issues, we

5 point that out.

6          THE COURT:  Thank you for that.  All right.  Unless

7 there's anything else, let's turn to Verizon's motion.

8      Mr. Godfrey, good evening.

9          MR. GODFREY:  Good evening, your Honor.  Verizon's

10 motion for judgment seeks dismissal of Adaptix's claims against

11 Verizon in the wave two Dell and Kyocera cases, and there are

12 three grounds for dismissal.  One is claim preclusion based on the

13 judgment in wave one.  Second is Kessler protection based on the

14 judgment in wave one, and the third is issue preclusion in light

15 of the judgments in wave three and four.

16      So I'll start with issue preclusion because that is the

17 doctrine that the Eastern District of Texas applied in granting

18 Verizon's motion in cases that involved LG and Pantech devices.

19          THE COURT:  These are Judge Schrader's cases, correct?

20          MR. GODFREY:  Correct, your Honor.

21          THE COURT:  Okay.

22          MR. GODFREY:  So this Court's August order in the wave

23 three and four cases, as we understand it, determined that claim

24 preclusion and the Kessler doctrine bar Adaptix's claims against

25 Verizon both in cases involving Apple and HTC devices and in cases

1 involving devices manufactured by another entity, Dell. There was

2 a Verizon wave four case involving Dell devices. And,

3 specifically, page 22 of the August order includes that the wave

4 three cases involving Apple and HTC must be dismissed on their

5 claim preclusion in Kessler, and then as we understand it,

6 footnote 105 on that page extends that claim preclusion and

7 Kessler ruling to the claims against Verizon in the wave four Dell

8 case. And immediately following that order, your Honor entered

9 judgment in not only the Apple and HTC cases but also the wave

10 four Dell case.

11            THE COURT: I certainly don't recall and certainly

12 don't see anywhere else in the opinion I issued any findings or

13 rulings that would allow me to enter judgment in the -- against

14 Adaptix in the Verizon case, and that would certainly suggest that

15 the footnote was critical and the only analysis I provide, right?

16            MR. GODFREY: That was the reference we saw, your

17 Honor.

18            THE COURT: Okay.

19            MR. GODFREY: So, as a result of that ruling and

20 judgment, issue preclusion now bars Adaptix from relitigating

21 claim preclusion and the Kessler doctrine for the claims against

22 Verizon.

23            THE COURT: And just to be precise, so the issue which

24 gives rise to preclusion is now the decision of the Court on

25 Kessler, et al in the earlier opinion, right?

1         MR. GODFREY: As applied to Adaptix's claims against

2 Verizon.

3         THE COURT: Understood. Okay.

4         MR. GODFREY: Yes, your Honor.

5         THE COURT: Now this is meta in the highest order.

6         MR. GODFREY: Meta preclusion, your Honor.

7         THE COURT: Yeah. Okay.

8         MR. GODFREY: And so Verizon made this identical issue

9 preclusion argument in the Texas cases involving LG and Pantech

10 devices, and Judge Schrader granted the motion and entered final

11 judgment, and Adaptix's appeal in those cases was docketed with

12 the Federal Circuit earlier this month. And in his decision,

13 Judge Schrader expressly rejected Adaptix's argument that the

14 issue would not be identical because the manufacturer of the

15 devices in that case, Pantech and LG, was different from the

16 manufacturer in wave three here, Apple and HTC.

17         THE COURT: Did Judge Schrader rely upon any other

18 grounds in dismissing those claims or was the issue preclusion,

19 meta preclusion argument the only one that he had to grapple with

20 or chose to grapple with anyway?

21         MR. GODFREY: That was certainly the primary argument,

22 your Honor.

23         THE COURT: Yeah.

24         MR. GODFREY: And so issue preclusion alone warrants

25 dismissal of Adaptix's claims in the Kyocera and Dell cases here.

The second ground I mentioned, if you were to go past issue
preclusion and reconsider the merits of claim preclusion as we've
argued before, it's the same parties, Adaptix and Verizon.  It's
the same patent.  There's a final judgment, and the accused
devices are essentially the same because the allegedly infringing
functionality is set within the standard.

THE COURT:  I'm sorry for bouncing around, Mr. Godfrey,
but going back to Judge Schrader's decision, am I right in
understanding that Verizon as well as AT and T benefitted from
Judge Schrader's ruling?

MR. GODFREY:  That's correct, your Honor.

THE COURT:  Okay.  Got it.  Okay.  Got it.

MR. GODFREY:  So Adaptix proposes alternative tests for
claim preclusion.  One of them is whether there can be claim
preclusion, but Adaptix proposes there can be no claim preclusion
unless it's split its claim against Verizon.  As we argue in our
briefing, Adaptix did split its claim against Verizon and did so
voluntarily.  Adaptix could have filed a single case against
Verizon and named as accused devices all of the LTE devices that
Verizon sells or uses.  Adaptix has taken that approach in later
cases involving related patents.  Here it chose not to do so.  It
chose to divide its claim against Verizon across multiple suits.

So even if your Honor were to apply that framework, there
was the splitting of the claim, and it would be claim preclusion
here.

The second argument Adaptix raises in its brief is that there can be no claim preclusion because, in its view, Verizon acquiesced to the multiple suits, and there's a reference to the Restatement Second of Judgment and other cases in its brief. The only Ninth Circuit case that Adaptix cites, Clements V. Airport Authority of Washoe County, concerned very different facts than what we have here. So there the Defendants did not raise -- they do not object to the multiple suits at all during the District Court proceeding. They didn't raise the issue in their appellate briefing.

THE COURT: So it was a waiver?

MR. GODFREY: Yeah. And so three months after the appeal oral argument, they filed supplemental briefing raising for the first time this argument of claim preclusion and the Ninth Circuit in that context that there had been a waiver. That's very different from what we have here, and in the opinion the Ninth Circuit notes specifically that the Defendants during the District Court proceedings never objected and, as an example, they give a Rule 12 motion, a motion to dismiss. Well, that's exactly what we have here. We're bringing a Rule 12 motion to bring this issue, and we filed that motion before the close of fact discovery. So it's a very different case here.

THE COURT: Not to invade your work product or your mental impressions, Mr. Godfrey, but I'm always looking to learn here. It occurred to me when I saw your motion you very carefully

and specifically chose Rule 12(c) as the vehicle upon which to
bring the issue to the Court's attention.  Was there a specific
reason why you brought this as a 12(c) as opposed to a 12(b)(6)
that you can share?

     MR. GODFREY:  These cases are further along and that
Verizon has --

     THE COURT:  I take it that an answer had already been
filed at that point.

     MR. GODFREY:  That's correct, your Honor.

     THE COURT:  So as a matter of timing you were probably
not in a position to bring a 12(b)(6), is that --

     MR. GODFREY:  The timing was different.  We were
farther along but still before the close of fact discovery.

     THE COURT:  I thought I'd ask.  Okay.  Anything else
you need to tell me about this?

     MR. GODFREY:  Just something to add on the <u>Brain Life</u>
decision.  I think Mr. Pankratz addressed the main point, but I
did want to note that the Federal Circuit's opinion -- and this is
going to the <u>Kessler</u> issue.  The Federal Circuit's opinion did not
make a determination of whether the ERGO Plus Plus product was
essentially the same as the products in the earlier cases.

     THE COURT:  They sent it back to the Southern District?

     MR. GODFREY:  I think that could be important.  They
just -- they don't make a determination, and it wouldn't be the
Federal Circuit's role in the first instance to make such a

1  determination on appeal.

2        THE COURT:  Okay.  I think I have it, Mr. Godfrey.

3  Thank you.

4     Mr. Foster?

5        MR. FOSTER:  Since he returned to <u>Brain Life</u>, let me

6  read what the Federal Circuit said about the ERGO product:

7               "While similarities between it and the

8               products actually litigated may mean that

9               certain questions regarding infringement of

10              the system claims effectively may be

11              foregoing conclusions."

12     You can read the case and interpret it, but it seems to me

13  they're saying it doesn't really matter.  It wasn't involved.

14     All right.  Again, I'm going to take my argument out of

15  order because of what my colleague said.  On the last slide in the

16  next section, which is the <u>Clements v. Airport Authority</u>, I'm

17  going to call your Honor's attention to the last paragraph which

18  talks about:

19              "Allowing the Defendants to assert

20              claim preclusion at this late stage would

21              work a substantial injustice on Plaintiffs.

22              If the Defendants had asserted their defense

23              earlier, either by formally objecting to the

24              dual proceedings through a motion to dismiss

25              or by asserting a defense in their

1          responsive pleadings, Plaintiff would have

2          had timely notice of the Defendant's claim

3          and would have been able to take appropriate

4          action."

5     It was incumbent upon them to raise this issue during the

6  Apple, HTC case when there were dual proceedings.  let me back up

7  a step.

8          THE COURT:  So in wave one is what you're saying?

9          MR. FOSTER:  Excuse me?

10         THE COURT:  You're saying during wave one they should

11 have raised this issue?

12         MR. FOSTER:  Yeah.  Well, let me put it in context.

13         THE COURT:  Go ahead.

14         MR. FOSTER:  Because there's a story to be told here.

15 So you start with the AIA, which says you cannot sue two handset

16 manufacturers in one case.  Everybody agrees with that.  So

17 Adaptix made the decision to sue in pairs a carrier and a handset

18 manufacturer, same claim.  It seemed like a good idea.  It's an

19 academic question whether that causes claim preclusion or not, but

20 we'll get to that in a minute.  Nobody thought of that at the time

21 on either side of the versus.  And that's why I'm talking about

22 this here.  If they had a problem with "Wait a minute.  You sued

23 us -- Apple -- you sued up in the Apple," as soon as they see --

24 if they bring it up at the time, we come in and we say "What are

25 we going to do about this," and it may well be the solution that

would have been all right, we'll have three -- four suits, one against just AT and T for all and one against just Verizon, same for Apple.  That would be worked out, and that's what the Court in the Ninth Circuit is talking about in this last paragraph.  If you raise the motion during the duality, then the courts get a chance to work that out, but if you sit on your hands and wait until one case is dismissed and say -- and pop up and say "Ah ha, claim preclusion," you get the kinds of inequities that the Ninth Circuit is talking about in <u>Clements</u>, and it's not just <u>Clements</u>. <u>Clements</u> adopted the position in the <u>Restatement Second Judgment 26</u> which we cited in the first paragraph, and that is on the previous slide which talked -- and we've been through this before, talked about why that is.

All right.  Let me get back to my regular organization, which let's start with claim preclusion, different Defendant issue.  This is so simple.  These cases involve the use of Sony Amazon, Dell, Kyocera.  The final judgment was in Apple and HTC. We don't see it as the same claim, certainly at the handset level, but we allowed -- and they didn't make that argument in their initial papers, but we allow them, okay, you -- you could have made the argument and then you have the acquiescence problem, but going back to my second slide, let's suppose we had a patent which had something to do with an automobile part.  So we sue Ford and we win.  Great.  So we sue General Motors.  The lawyers come in and say "Wait a minute.  Claim preclusion.  Our products in this

1  respect are identical to yours, to Ford's." And, in fact, those

2  are the cases they've been cited. That's their argument, "Our

3  products are like those of Apple and HTC." But, no, it's --

4          THE COURT: Aren't the parties different in your

5  hypothetical as opposed to --

6          MR. FOSTER: Excuse me?

7          THE COURT: Aren't your parties different in your

8  hypothetical as opposed to just the products? You --

9          MR. FOSTER: Yeah, well, that's the point I'm trying to

10 make.

11         THE COURT: Okay.

12         MR. FOSTER: And in this paragraph, claim preclusion

13 requires both the same Defendant and similar products. The

14 similar products test is only invoked if it's the same Defendant.

15 So if you sue Ford in the first case and then Ford in the second

16 case, the issue is "Wait a minute, the -- are they the same," but

17 if you sue General Motors in the second case, you never get to the

18 -- it's, hey, this is General Motors. You're not bringing a Ford

19 claim.

20         THE COURT: Right.

21         MR. FOSTER: And I keep saying this in our briefs, and

22 they keep saying that we're ignoring the test for claim

23 preclusion, which is where the products are the same. Well, no,

24 it's not the test when it's different products. And, as I say,

25 here these claims are for the use of Sony products on the network,

not the claims of Apple and HTC products.

Well, we've covered those in our briefs.  Like I said, they could have made an argument which we outlined for them in our response, and they picked up on the reply, and we said that argument wouldn't apply because of the acquiescence issue.  So, again, I've argued this before.  I'm not going to spend any more time on it today.

THE COURT:  Thank you, Mr. Foster.

MR. FOSTER:  Oh, one issue.  Don't rush out here.  The Texas decision, this is where they have commented.  So Judge Schrader gets these preclusion motions.  He reads your opinion August 21 and says, "Well, based upon what I think Judge Grewal did, I am bound and I got to do this."  Okay.  All right.  So we have filed motions asking you either to clarify or to reach a different decision, which you may reject, but if you grant any of them -- if you reject them, then fine, but if you grant any of them, then the question is, "Well, what do we do about Judge Schrader," and I think I mentioned this when I was here last time.  My assuming that it's appropriate, I think the course for us to do, because we've already filed a notice of appeal.  He doesn't have jurisdiction, but I understand the practice in the Fifth Circuit is then you go to the judge and say "Judge, look what Judge Grewal did.  If you had known that, if this had happened before you made a decision, would this have changed your decision?"  Then -- and then the practice there is the judge --

1   assuming the answer is yes, then he issues -- say, "Well, yes,

2   this has happened," and then the parties then take that to the

3   Appellate Court and they send the case back.

4        So I just wanted to outline that's the procedure.  Yes,

5   Judge Schrader did decide what he did.  He was acting on what he

6   thought your reasoning was, and if you change in any respect, that

7   may affect what Judge Schrader does.

8            THE COURT:  All right.  Thank you, Mr. Foster.

9        Mr. Godfrey, any rebuttal to that?  I take it you would

10  agree whatever Judge Schrader may or may not do with any of my

11  opinions is, of course, Judge Schrader's responsibility, right?

12           MR. GODFREY:  Yes, your Honor.

13           THE COURT:  Okay.  Go ahead.

14           MR. GODFREY:  Just to address the Ford, General Motors

15  hypothetical, I think your Honor's observation that that would be

16  different parties is an important one.  I think the -- that's not

17  what's going on here where we have a lawsuit against one defendant

18  and a lawsuit against a different defendant and that different

19  defendant who is a non-party is seeking to argue claim preclusion.

20       What we have with respect to Verizon's motion, for example,

21  is Verizon, who is a party to the first case and the second case,

22  arguing claim preclusion.  So that would be like if the Plaintiff

23  sued Ford or some industry standardized component, a spark plug or

24  something, brought the first suit and accused the Ford Tempo, lost

25  and then filed another lawsuit accusing the Ford Taurus, Ford

Fiesta and so on, that's closer to what's going on here.  That's

where claim preclusion would apply.

Thank you, your Honor.

THE COURT:  All right.  Thank you.

All right.  Unless I have overlooked a motion, I believe we

have covered those motions which are to be argued this evening.

Mr. Clonts, I didn't give you a chance to say anything.

Would you like to add anything to your colleague's comments?

MR. CLONTS:  No, your Honor.  Thank you very much.

THE COURT:  All right.  Is there anything else I can

help you with this evening, gentlemen?

MR. PANKRATZ:  I'll take five seconds of your time to

answer your curiosity question from earlier.

THE COURT:  Sure.

MR. PANKRATZ:  The Brain Life case has been dismissed

on stipulation of the parties.  So --

THE COURT:  Yeah.  I believe Judge Bencivengo mentioned

they settled after the remand if I'm not mistaken.  Okay.  All

right.  Anything else?  Thank you for that clarification.

How's everything else working out otherwise?  Are there any

other brewing issues I can help you with now that might save us

some letter briefing?

MR. FOSTER:  Just let you know, your Honor, that after

I leave this courtroom, I'm going up to meet with ZTE and Judge

Cousins.

1          THE COURT:  Okay.  All right.  Well, I won't keep you

2    from that important work.  Have a wonderful evening.  Thank you

3    again for your patience.

4          ALL:  Thank you, your Honor.

5          THE CLERK:  Operator, that concludes our calendar.

6          THE COURT:  Thank you, Operator.

7          OPERATOR:  Thank you, your Honor.

8      (Proceedings adjourned at 5:25 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## <u>CERTIFICATE OF TRANSCRIBER</u>

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.



Echo Reporting, Inc., Transcriber

Wednesday, December 2, 2015